THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **3:22-CR-135** |
| | : | **(JUDGE MARIANI)** |
| VICTORIOUS MINTER, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I.  INTRODUCTION AND PROCEDURAL HISTORY

On April 5, 2022, a federal grand jury returned a one-count Indictment charging

Defendant Victorious Minter with being a Felon in Possession of Firearm, in violation of 18

U.S.C. § 922(g)(1).[1]  Defendant Minter subsequently filed a Motion to Dismiss (Doc. 26) on

August 26, 2022, asserting that § 922(g)(1) is now unconstitutional in light of the Supreme

Court's June 23, 2022, decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*,

142 S.Ct. 2111 (2022).  Defendant requests that the Court "declare § 922(g)(1)

unconstitutional and dismiss the Indictment against him for failure to state an offense."

(Doc. 26, at 3).  The Government timely filed a Brief in Opposition to Minter's Motion to

Dismiss (Doc. 28), to which Defendant filed a Reply Brief (Doc. 31).  Defendant's Motion to

---

[1] Defendant Minter had previously been convicted of Manufacture, Delivery, or Possession with Intent to Manufacture or Deliver a Controlled Substance, in violation of 35 Pa.C.S.A. § 780-113(a)(30). (Doc. 28, at 2).

Dismiss is now ripe for resolution.

For the reasons set forth herein, the Court will deny the Motion to Dismiss (Doc. 26).

## II. ANALYSIS

The Second Amendment of the U.S. Constitution provides that "[a] well regulated

Militia, being necessary to the security of a free State, the right of the people to keep and

bear Arms, shall not be infringed."  U.S. CONST. amend. II.  In *Bruen*, the Supreme Court,

consistent with its precedent, re-affirmed that "the Second and Fourteenth Amendments

protect an individual right to keep and bear arms for self-defense."  *Bruen*, 142 S.Ct. at 2125

(citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561

U.S. 742 (2010)); *see also, id.* at 2122 ("In [*Heller* and *McDonald*] we recognized that the

Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to

possess a handgun in the home for self-defense.").

Although the Second Amendment confers an individual right to keep and bear arms,

this right is "not unlimited".  *Heller,* 554 U.S. at 595, 626.  As the Supreme Court in *Heller*

explained:

> Like most rights, the right secured by the Second Amendment is not unlimited.
> From Blackstone through the 19th-century cases, commentators and courts
> routinely explained that the right was not a right to keep and carry any weapon
> whatsoever in any manner whatsoever and for whatever purpose. . . For
> example, the majority of the 19th-century courts to consider the question held
> that prohibitions on carrying concealed weapons were lawful under the Second
> Amendment or state analogues. . . . Although we do not undertake an
> exhaustive historical analysis today of the full scope of the Second
> Amendment, nothing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms by felons and the

mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-627 (internal citations omitted).  *See also*, *McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here.") (internal citation omitted).[2]

In examining its precedent, the Supreme Court in *Bruen* set forth the appropriate test a Court must apply in determining whether a firearm regulation violates the Second Amendment:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Bruen*, 142 S.Ct. at 2126 (internal quotation marks omitted).  *See id.* at 2127 ("the

---

[2] When setting forth the above-quoted "longtime prohibitions" and explicitly warning that nothing in its opinion "should be taken to cast doubt" on these longstanding prohibitions, the *Heller* Court titled these prohibitions as "*presumptively* lawful regulatory measures."  *Heller*, 554 U.S. at 627 n. 26 (emphasis added).  Nonetheless, two years later in *McDonald*, the Supreme Court confirmed the continued validity of its statement in *Heller* as to the legality of the longtime prohibitions, without the re-iteration or inclusion of any qualifying language.

government must affirmatively prove that its firearms regulation is part of the historical

tradition that delimits the outer bounds of the right to keep and bear arms."); *id*. at 2130 (re-

iterating the standard for applying the Second Amendment).  A Court must therefore first

address the threshold question of whether the Second Amendment's plain text covers the

individual's conduct at issue and, if it determines the conduct is covered, engage in an

analysis of whether the Government has affirmatively demonstrated that the regulation at

issue is consistent with this Nation's historical tradition of firearm regulation.

The *Bruen* Court provided guidance to aid courts in determining whether the

Government has affirmatively demonstrated that the regulation at issue is consistent with

this Nation's historical tradition of firearm regulation, explaining that "[i]n some cases," the

inquiry that courts must undertake to assess whether modern firearms regulations are

consistent with the Second Amendment's text and historical understanding "will be fairly

straightforward", *Bruen*, 142 S.Ct. at 2131.

> For instance, when a challenged regulation addresses a general societal
> problem that has persisted since the 18th century, the lack of a distinctly similar
> historical regulation addressing that problem is relevant evidence that the
> challenged regulation is inconsistent with the Second Amendment. Likewise, if
> earlier generations addressed the societal problem, but did so through
> materially different means, that also could be evidence that a modern regulation
> is unconstitutional. And if some jurisdictions actually attempted to enact
> analogous regulations during this timeframe, but those proposals were rejected
> on constitutional grounds, that rejection surely would provide some probative
> evidence of unconstitutionality.

*Id*.

4

Nonetheless, the Court in *Bruen* recognized that while some "historical analogies . . . are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 2132. "The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution – and a Second Amendment – intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs. Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*. at 2132 (internal quotation marks and citations omitted). Thus,

> When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy – a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." And because "[e]verything is similar in infinite ways to everything else," one needs "some metric enabling the analogizer to assess which similarities are important and which are not[.]"

*Bruen*, 142 S.Ct. at 2132 (internal citations omitted). "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. at 2133 (italics in original). Further, the *Bruen* Court, while declining to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment", reasoned that

*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); *see also id.,* at 628, 128 S.Ct. 2783 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry.

*Id*. at 2132-2133 (italics in original).

Here, in light of the Supreme Court's decision in *Bruen*, Defendant Minter invites this Court to set aside over 10 years of Supreme Court and Circuit Court precedent and to examine, on a blank slate, the constitutionality of § 922(g)(1). However, *Bruen* does not, as Defendant suggests, invalidate or overturn the legal principles and analysis set forth in *Heller* and *McDonald*, and much of the legal reasoning in Circuit decisions since *Heller* remains intact. The Supreme Court's decision in *Bruen* did not alter the analyses set forth in *Heller* and *McDonald*, but instead, relying extensively on those two cases, clarified the appropriate test that must be applied in addressing Second Amendment challenges to firearms regulations. In *Bruen*, the Court rejected the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny" that had been applied by the lower courts after *Heller* and *McDonald*, holding that the second-step – application of a "means-end" analysis – "is one step too many." *Bruen*, 142 S.Ct. at 2126-2127. In so doing, the Court emphasized that "[s]tep one of the predominant framework [determining whether regulated conduct falls beyond the Second Amendment's original

scope] is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id*. at 2127. The Supreme Court in *Bruen* took great effort to not undermine its prior decisions in *Heller* and *McDonald* and to repeatedly underscore the continued validity of those decisions. *See e.g.*, *Bruen*, 142 S.Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id*. ("*Heller* itself exemplifies" the straight-forward inquiry into the Second Amendment's text and historical understanding); *id*. at 2132-2133 ("*Heller* and *McDonald* point toward at least two metrics [to assess whether a historical regulation is a proper analogue for a modern firearm regulation]: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").

Thus, the Court here need not engage in an original analysis of whether the Second Amendment's plain text covers the possession of a firearm by a felon, and if so, whether the Government has affirmatively demonstrated that § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation, where the Supreme Court in *Bruen* has already signaled the answer to this question.

The Court in *Heller* made clear that the rights secured by the Second Amendment are not unlimited, enumerating a number of examples including the "longstanding

prohibitions on the possession of firearms by felons". *Heller*, 554 U.S. at 626-627. [3]

Despite Defendant Minter's assertions to the contrary, the *Bruen* Court's decision did not

undermine *Heller*'s statement. *Bruen*, quoting *Heller*, re-iterated that "[t]he Second

Amendment 'is the very *product* of an interest balancing by the people' and it 'surely

elevates above all other interests the right of <u>law-abiding</u>, responsible citizens to use arms'

for self-defense. It is this balance – struck by the traditions of the American people – that

demands our unqualified deference." *Bruen*, 142 S.Ct. at 2131 (quoting *Heller*, 554 U.S. at

635) (italics in original; underline added).[4] The *Bruen* Court further stated that "[t]hroughout

---

[3] In addition to Minter's arguments set forth in the body of this memorandum opinion, Minter also urges this Court to reject *Heller*'s language addressing the presumptive lawfulness of certain longstanding prohibitions on the possession of firearms by felons, arguing that this language is dicta and nothing more than an "aside" by the Supreme Court (Doc. 31, at 7-8). The Third Circuit has squarely rejected the characterization of this language in *Heller* as dicta. *See United States v. Huet*, 665 F.3d 588, 600 n. 11 (3d Cir. 2012) ("Although some of our sister circuits have classified the 'presumptively lawful' language in *Heller* as dicta, . . . we disagree."), *abrogated on other grounds by United States v. De Castro*, --F.4th--, 2022 WL 4477327 (3d Cir. 2022). *See also, Binderup v. Att'y Gen.*, 836 F.3d 336, 359 n.3 (3d Cir. 2016) ("we have concluded that *Heller*'s list constitutes a limitation on the scope of its holding and does not qualify as dicta.") (Hardiman, J., concurring in part).

Even if this Court were to find the *Heller* language to be dicta, the statement in *Heller* remains highly persuasive where the Third Circuit has warned that "lower federal court[s] . . . are advised to follow the Supreme Court's 'considered dicta'", *Oyebanji v. Gonzales*, 418 F.3d 260, 264-265 (3d Cir 2005) (collecting cases) (Alito, J). *See also, Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008) (in analyzing issue of standing, explaining that "even if the [Supreme] Court's rejection of the reasonable apprehension test could be plausibly characterized as *dicta,* our job as a federal appellate court is to follow the Supreme Court's directions, not pick and choose among them as if ordering from a menu.") (Gorsuch, J.).

[4] In addition to the above-quoted statement in *Bruen*, when performing its analysis of the contours of the Second Amendment, the majority in *Bruen* repeatedly, although not uniformly, used the words "law-abiding". *See e.g.*, *Bruen*, 142 S.Ct. at 2122 ("In [*Heller*] and [*McDonald*], we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, <u>law-abiding</u> citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, <u>law-abiding</u> citizens have a similar right to carry handguns publicly for their self-defense."); *id*. at 2124-2125 (petitioners "are <u>law-abiding</u>, adult citizens of Rensselaer County, New York"); *id*. at 2134 (petitioners are "ordinary, <u>law-abiding</u>, adult citizens" and are "part of 'the people' whom the Second Amendment protects."); *id*. at

modern Anglo-American history, the right to keep and bear arms in public has traditionally

been subject to well-defined restrictions governing the intent for which one could carry arms,

the manner of carry, or the exceptional circumstances under which one could not carry

arms." *Id.* at 2138.  This observation in *Bruen* is entirely consistent with *Heller*'s recognition

of the legality of the "longstanding prohibitions on the possession of firearms by felons and

the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as

schools and government building. . ."  *Heller*, 554 U.S. at 626-627.[5]

_____

2132-2133 ("While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."); *id*. at 2138, 2150, 2156 (there is no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense."); *id*. at 2156 (holding that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.") (underlines added).  *See also*, *Heller*, 554 U.S. at 635 ("whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.") (underline added).

   [5]  Furthermore, the majority in *Bruen*'s express warning that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" indicates a continued consensus that *Heller*'s stated-limitations remain outside the protection of the Second Amendment.  As the *Bruen* Court explained, without the need for historical analysis:

> Because these [shall-issue] licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. *District of Columbia v. Heller*, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens."

*Bruen*, 142 S.Ct. at 2138 n. 9.  Although the Supreme Court clarified that "because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes", it set forth possible bases for such challenges as "where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id*. The *Bruen* Court's general approval of the constitutionality and validity of "shall-issue" regulations, and its recognition that

The conclusion that *Bruen* does not disturb the prior analyses of *Heller* and

*McDonald* is further supported by the concurrences and the dissent in *Bruen*. Justice Alito,

in his concurrence, specifically noted the following:

> Our holding [in *Bruen*] decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns.

*Bruen*, 142 S.Ct. at 2157 (Alito, J., concurring) (underline added); *see also*, *id.* at 2161

("*Heller* correctly recognized that the Second Amendment codifies the right of ordinary law-

abiding Americans to protect themselves from lethal violence by possessing and, if

necessary, using a gun.") (underline added). Justice Kavanaugh, with whom Chief Justice

Roberts joined, wrote separately "to underscore two important points about the limits of the

Court's decision" in *Bruen*. The second point reads as follows:

> *Second*, as *Heller* and *McDonald* established and the Court today again explains, the Second Amendment "is neither a regulatory straightjacket nor a regulatory blank check." . . . Properly interpreted, the Second Amendment allows a "variety" of gun regulations. *Heller*, 554 U.S. at 636, 128 S.Ct. 2783. As Justice Scalia wrote in his opinion for the Court in *Heller*, and Justice ALITO reiterated in relevant part in the principal opinion in *McDonald*:
>
> > "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner

these regimes are often meant to ensure that only "law-abiding, responsible" citizens are permitted to possess firearms, suggests the continued validity of *Heller*'s enumerated-limitations and the constitutionality of § 922(g)(1). This Court further notes that the *Bruen* Court broadly cited to "law-abiding" citizens, declining to signal any deficiency in a state's failure to draw a distinction between individuals who may be considered non-law-abiding due to violent, as opposed to non-violent, crimes.

whatsoever and for whatever purpose.... [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.] . . .

*Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring).  Justice Breyer, in his dissenting opinion, agreed with Justice Kavanaugh, stating that "[l]ike Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on th[e] aspect of *Heller's* holding" addressing presumptively lawful firearm restrictions, including the prohibition of the possession of a firearm by a felon, *id*. at 2189 (Breyer, J., dissenting).[6]

_____

[6] This Court also notes Justice Alito's dissent in *New York State Rifle & Pistol Association, Inc. v. City of New York*, 140 S.Ct. 1525 (2020), issued two years prior to *Bruen*.  In that case, the Supreme Court vacated the judgment of the Second Circuit Court of Appeals and remanded the case for further proceedings where it deemed Petitioners' claim for injunctive relief against New York City moot because the city had altered its firearm licensing statute following the Supreme Court's grant of certiorari.  In dissent, Justice Alito opined that the case was not moot and proceeded to an analysis of the merits of plaintiffs' claim that the city firearm ordinance violated the Second Amendment.  Justice Alito began his analysis as follows:

> In *Heller*, we held that a District of Columbia rule that effectively prevented a law-abiding citizen from keeping a handgun in the home for purposes of self-defense constituted a core violation of the Second Amendment. 554 U.S. at 635, 128 S.Ct. 2783. We based this decision on the scope of the right to keep and bear arms as it was understood at the time of the adoption of the Second Amendment. *Id*., at 577-605, 628-629, 128 S.Ct. 2783. We recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals. *See id*., at 626-627, 128 S.Ct. 2783; *see also McDonald*, 561 U.S. at 787, 904, 130 S.Ct. 3020. But history provided no support for laws like the District's. *See* 554 U.S. at 629-634, 128 S.Ct. 2783.

*Id*. at 1540-1541 (Alito, J., dissenting).  Justice Alito's dissent concluded by foreshadowing the Supreme Court's eventual holding in *Bruen* rejecting the application "means-end" scrutiny.  *Id*. at 1544 ("We are told that the mode of review in this case is representative of the way *Heller* has been treated in the lower courts.

The concurrences and dissent in *Bruen* underscore that the Supreme Court foresaw the legal challenges which may arise as a result of *Bruen*, including the issue now raised in the present motion to dismiss by Minter.  That Justices Kavanaugh, Roberts, and Alito each determined the need to highlight the particular language in *Heller* setting forth certain presumptively lawful "longstanding prohibitions" demonstrates a desire to make clear the limits of the Supreme Court's decision in *Bruen* and to emphasize the remaining viability of the Supreme Court's statements in *Heller* and its progeny as to specific conduct which falls outside of the protection of the Second Amendment and which may be properly curbed by gun regulations.  Although this Court acknowledges the possible accuracy of Justice Breyer's statement in dissent that an apparent "disconnect" exists between the "presumptively lawful regulatory measures" identified in *Heller*, most of which arguably have clearer origins in the 20th century, and the Supreme Court's test requiring that a firearm regulation must be consistent with this Nation's historical tradition of firearm regulation in order to not violate the Second Amendment (*see Bruen*, 142 S.Ct. at 2189 (Breyer, J., dissenting)), six Justices nonetheless warned that the *Bruen* decision should not be read as

---

If that is true, there is cause for concern.").  Although Justice Kavanaugh concurred with the majority, he wrote separately, stating that while he agreed that the claim for injunctive relief was moot, he "agree[d] with Justice Alito's general analysis of *Heller* and *McDonald*" and "share[d] Justice Alito's concern that some federal and state courts may not be properly applying *Heller* and *McDonald*." *Id*. at 1527 (Kavanaugh, J., concurring).  Justices Alito and Kavanaugh's statements in this 2020 precursor to *Bruen* further support a finding that the Supreme Court did not intend anything in *Bruen* to be interpreted as overturning or modifying its decision in *Heller*, including *Heller*'s "recogni[tion] that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws . . . prohibiting possession by felons and other dangerous individuals", *id*. at 1540-1541 (Alito, J., dissenting).

casting doubt on the validity of certain firearms regulations, including those identified in *Heller*. Specifically, Justices Alito, Kavanaugh, and Roberts, in concurring, all made explicit reference to *Heller*'s enumerated lawful firearm restrictions and emphasized that the decision in *Bruen* did not disturb this statement in *Heller*. Additionally, the dissent, Justices Breyer, Sotomayor, and Kagen, also noted agreement that the majority in *Bruen* did not "cast . . . doubt" on *Heller*'s identification of "presumptively lawful firearm" restrictions. *Cf. United States v. Gonzalez*, 2022 WL 4376074 (7th Cir., Sept. 22, 2022) (acknowledging that "the historical evidence is mixed about barring *all* felons from possessing guns" but, citing to *Heller* and *Bruen*, noting that "the [Supreme Court Justices] have declined to question laws requiring background checks or barring felons from possessing firearms") (italics in original).

Where *Bruen* did not overturn, abrogate, or otherwise suggest that the longstanding prohibitions identified in *Heller*, including the prohibition of possession of firearms by felons, may no longer be lawful, this Court is bound by the Supreme Court's decision in *Heller*, its progeny, and the Third Circuit cases addressing the constitutionality of § 922(g)(1).

As the Third Circuit noted in 2020, "[s]ince *Heller*, we, along with every court to consider the issue, have rejected challenges that § 922(g)(1) on its face violates the Second Amendment." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 901 (3d Cir. 2020). In *Folajtar*, although not "fully repeat[ing] the historical analysis in [its] precedents", the Third Circuit identified the history of restricting the possession of firearms by certain individuals, including those who lacked "virtuousness" or had committed a serious crime. *Id*. at 907-909. In so doing, the

13

Third Circuit explained that "[w]hat concerned the Framers was that 'virtuous citizens' retain the right to bear arms. . . ; they had no interest in extending the same guarantee to those who act counter to society's welfare, whether by violent or non-violent acts." *Id.* at 909 (internal citation omitted).  Prior to *Folajtar*, in *Binderup v. Attorney General*, the Third Circuit "look[ed] to the historical justification for stripping felons, including those convicted of offenses meeting the traditional definition of a felony, of their Second Amendment rights," 836 F.3d 336, 348 (3d Cir. 2016).  The Court noted that "[t]he view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era" and concluded as "[t]he takeaway: persons who have committed serious crimes forfeit the right to possess firearms much the way they forfeit other civil liberties, including fundamental constitutional rights." *Id*. at 349 (internal quotation marks omitted).

Defendant Minter cites to Judge Bibas' dissent in *Folajtar* and Judge Hardiman's partial concurrence in *Binderup* in support of his position that Judges in the Third Circuit "have noted the lack of relevant historical precedent for felon disarmament statutes like § 922(g)(1)," (Doc. 27, at 12).  Although Defendant's characterization of Judge Bibas and Judge Hardiman's opinions are correct, as is his citation to the opinions of other Circuit Court judges outside the Third Circuit, the District Court is nonetheless bound to follow the majority reasoning and holding in the cited opinions.  Even assuming that the Third Circuit in *Folajtar* and *Binderup* incorrectly applied some form of means-end scrutiny, the majority in *Folajtar* and the plurality in *Binderup* nonetheless also engaged in an analysis of the

14

historical tradition of preventing felons from possessing firearms. This Court is not free to

set aside this historical analysis and reasoning.[7] *See Allegheny Gen. Hosp. v. N.L.R.B.*,

608 F.2d 965, 970 (3d Cir. 1979) ("A decision by this court, not overruled by the United

States Supreme Court, is a decision of the court of last resort in this federal judicial circuit."),

*overruled on other grounds by St. Margaret Mem'l Hosp. v. N.L.R.B.,* 991 F.2d 1146 (3d Cir.

1993). Further, the Third Circuit's majority/plurality reasoning as to the historic basis for the

enactment of firearm regulations prohibiting felons from possessing firearms is not unique –

it finds support in the decisions of other Circuit Courts. *See Medina v. Whitaker*, 913 F.3d

152, 159 (D.C. Cir. 2019).[8]

---

[7]  Although in a different factual and legal context, this Court notes that post-*Bruen*, the Third
Circuit has re-affirmed that "the government may confiscate guns from those who have been convicted of
serious crimes or committed dangerous acts." *Frein v. Penn. State Police*, 47 F.4th 247, 256 (3d Cir. 2022)
(citing *Binderup v. Att'y Gen.*, 836 F.3d 336, 349 (3d Cir. 2016)).

[8]  In *Medina*, the Court of Appeals for the District of Columbia held that individuals convicted of
felonies "are not among those entitled to possess arms", 913 F.3d at 160. In support of this holding, the
D.C. Circuit Court looked to the historical rationales set forth in other Circuits:

> A number of other circuits have also considered this issue and have concluded that history
> and tradition support the disarmament of those who were not (or could not be) virtuous
> members of the community. At least four circuits have endorsed the view that "most
> scholars of the Second Amendment agree that the right to bear arms was tied to the
> concept of a virtuous citizenry and that, accordingly, the government could disarm
> 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010). *See
> also United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010); *Binderup v. Attorney
> General*, 836 F.3d 336, 348 (3d Cir. 2016); *United States v. Carpio-Leon*, 701 F.3d 974,
> 979 (4th Cir. 2012). The "virtuous citizen" theory is drawn from "classical republican political
> philosophy" and stresses that the "right to arms does not preclude laws disarming the
> unvirtuous (i.e. criminals) or those who, like children or the mentally imbalanced, are
> deemed incapable of virtue." *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009)
> (quoting Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L.
> Rev. 461, 480 (1995)). Several circuits have relied on this theory to uphold the
> constitutionality of modern laws banning the possession of firearms by illegal aliens and

Finally, although not binding on this Court, the Court notes that federal courts
nationwide have, as of the date of this memorandum opinion, uniformly rejected facial and
as-applied constitutional challenges to § 922(g)(1) arising from the Supreme Court's
decision in *Bruen*. *See e.g.*, *United States v. Ingram*, 2022 WL 3691350 (D.S.C., Aug. 25,
2022); *United States v. Cockerham*, 2022 WL 4229314 (W.D. Miss., Sept. 13, 2022); *United
States v. Jackson*, 2022 WL 4226229 (D. Minn., Sept. 13, 2022); *United States v. Hill*, 2022
WL 4361917 (S.D. Cal., Sept. 20, 2022); *United States v. Coombes*, 2022 WL 4367056
(N.D. Okla., Sept. 21, 2022); *United States v. Collette*, 2022 WL 4476790 (W.D. Tex., Sept.
25, 2022); *United States v. Siddoway*, 2022 WL 4482739 (D. Idaho, Sept, 27, 2022); *United
States v. Charles*, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States v. Price*, --
F.Supp.3d--, 2022 WL 6968457 (S.D. W. Va., Oct. 12, 2022). *See also*, *United States v.
Gonzalez*, 2022 WL 4376074 (7th Cir., Sept. 22, 2022).[9]

---

juveniles – classes of people who might otherwise show, on a case-by-case basis, that
they are not particularly dangerous. *See Carpio-Leon*, 701 F.3d at 979-81; *Rene E.*, 583
F.3d at 15. In considering these decisions, we recognize that there is "an ongoing debate
among historians about the extent to which the right to bear arms in the founding period
turned on concerns about the possessor's virtue." *Rene E.*, 583 F.3d at 16. While we need
not accept this theory outright, its support among courts and scholars serves as persuasive
evidence that the scope of the Second Amendment was understood to exclude more than
just individually identifiable dangerous individuals.

*Id.* at 159.

   [9] As previously noted, *supra*, since *Heller*, the Third Circuit, "along with every court to consider the
issue, have rejected challenges that § 922(g)(1) on its face violates the Second Amendment." *Folajtar*, 980
F.3d at 901. However, the Third Circuit has "permit[ted] Second Amendment challenges to § 922(g)(1) as
applied to individuals. . . " *Id*. Here, although Minter's brief in support of his motion to dismiss asserts that
"§ 922(g)(1) is unconstitutional, both facially and as applied to Mr. Minter" (Doc. 27, at 4), Defendant's
supporting brief does not set forth with any particularity the basis for his as-applied challenge, separate

### III. CONCLUSION

For the reasons set forth herein, Defendant Minter's Motion to Dismiss (Doc. 26) will

be denied.  A separate Order follows.

Robert D. Mariani
United States District Judge

---

from his arguments supporting his facial challenge. Defendant therefore has provided no basis for this
Court to engage in any separate analysis as to the constitutionality of § 922(g)(1) as-applied to Minter.