# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : 3:22-CR-135 |
| | : (JUDGE MARIANI) |
| VICTORIOUS MINTER, | : |
| | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On April 5, 2022, a federal grand jury returned a one-count Indictment charging Defendant Victorious Minter with being a Felon in Possession of Firearm, in violation of 18 U.S.C. § 922(g)(1).[1] Defendant Minter subsequently filed a Motion to Dismiss (Doc. 26) on August 26, 2022, asserting that § 922(g)(1) is now unconstitutional in light of the Supreme Court's June 23, 2022, decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). The Court denied Defendant's motion on October 18, 2022, and scheduled this action for trial. (Docs. 32, 33, 34).

On June 6, 2023, the Third Circuit Court of Appeals issued an opinion in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023), applying the test set forth by the Supreme

---

[1] Defendant Minter had previously been convicted of Manufacture, Delivery, or Possession with Intent to Manufacture or Deliver a Controlled Substance, in violation of 35 Pa.C.S.A. § 780-113(a)(30). (Doc. 53, at 2).

Court in *Bruen* and holding that § 922(g)(1) violated Plaintiff Bryan Range's Second Amendment rights, as-applied to him.

As a result of the Third Circuit's decision in *Range*, on July 11, 2023, Defendant Minter filed a "Motion for Reconsideration of Order of October 18, 2022" (Doc. 49) and supporting brief (Doc. 50). The Government filed a Brief in Opposition to Minter's Motion for Reconsideration (Doc. 53), to which Defendant filed a Reply Brief (Doc. 54). Defendant's Motion is now ripe for resolution.

For the reasons set forth herein, the Court will deny the Motion Reconsideration (Doc. 49).

## II. ANALYSIS

Defendant Minter requests reconsideration of the Court's denial of his Motion to Dismiss, "based on the Third Circuit's recent clarification of the law, in particular, the application of the holding in *Bruen* to Section 922(g)(1) in *Range*." (Doc. 49, ¶ 6).

Motions for reconsideration may be filed in both civil and criminal cases. *United States v. Fiorelli*, 337 F.3d 282, 286 (3d Cir. 2003). "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). Specifically, a motion for reconsideration is generally permitted only if (1) there is an intervening change in the controlling law; (2) new evidence becomes available that was not previously available at the time the Court issued its decision; or (3) to correct clear errors of law or fact or to

prevent manifest injustice. *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Moreover, "motions for reconsideration should not be used to put forward arguments which the movant . . . could have made but neglected to make before judgment." *United States v. Jasin*, 292 F.Supp.2d 670, 677 (E.D. Pa. 2003) (internal quotation marks and alterations omitted) (quoting *Reich v. Compton*, 834 F.Supp.2d 753, 755 (E.D. Pa. 1993) *rev'd in part and aff'd in part on other grounds*, 57 F.3d 270 (3d Cir. 1995)). Nor should they "be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant." *Donegan v. Livingston*, 877 F.Supp.2d 212, 226 (M.D. Pa. 2012) (quoting *Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 606 (M.D. Pa. 2002)).

With respect to Defendant Minter's facial challenge of § 922(g)(1), which was extensively briefed by the parties and addressed by the Court in denying the Motion to Dismiss, Defendant has failed to demonstrate a proper basis for reconsideration of the Court's prior opinion and order. Defendant's present motion relies on a belief that *Range* constitutes an intervening change in the controlling law with respect to both facial and as-applied challenges to § 922(g)(1) (Doc. 50, 2 n.1). It does not. The majority and concurring opinions in *Range* made clear that their decision was narrowly tailored to as-applied challenges of § 922(g)(1). The Court did not hold that § 922(g)(1) is unconstitutional on its face and instead was careful to instruct that the statute remained facially constitutional at this time. *See Range*, 69 F.4th at 106 ("Our decision today is a narrow one. Bryan Range

challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a).") (Hardiman, J., majority); *id*. at 109 (Government's failure to carry its burden in this case "does not spell doom for § 922(g)(1)" and the statute remains "'presumptively lawful'") (Ambro, J., concurring). This Court will thus deny Defendant's motion for reconsideration of its opinion and order denying his facial challenge to § 922(g)(1) without further analysis.

Minter asserts that his Motion to Dismiss (Doc. 26) argued that § 922(g)(1) was unconstitutional both on its face and as-applied to him (Doc. 49, ¶ 2). However, Defendant's Motion to Dismiss, and the Court's analysis thereof, focused only on a facial challenge to § 922(g)(1). As this Court noted in its Memorandum Opinion denying Defendant's Motion to Dismiss, "although Minter's brief in support of his motion to dismiss asserts that '§ 922(g)(1) is unconstitutional, both facially and as applied to Mr. Minter' (Doc. 27, at 4), Defendant's supporting brief does not set forth with any particularity the basis for his as-applied challenge, separate from his arguments supporting his facial challenge. Defendant therefore has provided no basis for this Court to engage in any separate analysis as to the constitutionality of § 922(g)(1) as-applied to Minter." (Doc. 32, 16-17 n. 9). Where Minter did not sufficiently brief or argue his as-applied challenge in his prior motion, the Court did not conduct an inquiry on this issue. "Reconsideration" is logically therefore not the proper avenue for relief as to Minter's as-applied challenge in light of *Range*. Nonetheless, due to the significance of *Range* and its impact on the application of as-

applied challenges of § 922(g)(1) by District Courts in the Third Circuit, the Court will deem Defendant's "Motion for Reconsideration" with respect to his as-applied challenge to be a second motion to dismiss and will address it as such, *infra*.[2]

The Second Amendment of the U.S. Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Bruen*, the Supreme Court, consistent with its precedent, re-affirmed that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen*, 142 S.Ct. at 2125 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)); *see also, id.* at 2122 ("In [*Heller* and *McDonald*] we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense.").

Although the Second Amendment confers an individual right to keep and bear arms, this right is "not unlimited". *Heller*, 554 U.S. at 595, 626. As the Supreme Court in *Heller* explained:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . . For

---

[2] Whereas "[t]o prevail on a facial challenge [to a statute], a plaintiff must 'establish that no set of circumstances exists under which the [law] would be valid,'" the standard for bringing an as-applied challenge "is less demanding; a plaintiff need only show that a law's 'application to a particular person under particular circumstances deprived that person of a constitutional right.'" *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 134 & n.7 (3d Cir. 2022) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) then *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)).

> example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-627 (internal citations omitted). *See also*, *McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here.") (internal citation omitted).

In examining its precedent, the Supreme Court in *Bruen* set forth the appropriate test a Court must apply in determining whether a firearm regulation violates the Second Amendment:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Bruen*, 142 S.Ct. at 2126 (internal quotation marks omitted). *See also, id.* at 2127 ("the government must affirmatively prove that its firearms regulation is part of the historical

6

tradition that delimits the outer bounds of the right to keep and bear arms."); *id.* at 2130 (reiterating the standard for applying the Second Amendment). A Court must therefore first address the threshold question of whether the Second Amendment's plain text covers the individual's conduct at issue and, if it determines the conduct is covered, engage in an analysis of whether the Government has affirmatively demonstrated that the regulation at issue is consistent with this Nation's historical tradition of firearm regulation. *See Range*, 69 F.4th at 101.

Applying the principles of *Bruen*, the Third Circuit in *Range* first answered in the affirmative the "threshold question" of whether Range is one of "the people" protected by the Second Amendment, reasoning that "the people" "refers to all members of the political community" and Second Amendment rights "presumptively 'belong[] to all Americans.'" *Range*, 69 F.4th at 101 (quoting *Heller*, 554 U.S. at 580, 581). The Circuit Court then turned to the first step of the *Bruen* analysis – whether the Second Amendment's plain text covers the individual's conduct at issue – finding that § 922(g)(1) does regulate Range's request to possess a rifle to hunt and a shotgun to defend himself at home and therefore the Second Amendment presumptively protects Range's conduct. *Id.* at 103.

Having determined that Range's conduct was protected by the Second Amendment, the Circuit Court engaged in the second step dictated by *Bruen*: an analysis of whether the Government had affirmatively demonstrated that it was justified in "applying § 922(g)(1) to Range 'by demonstrating that it is consistent with the Nation's historical tradition of firearm

7

regulation.'" *Range*, 69 F.4th at 103. The Third Circuit rejected each of the Government's arguments, ultimately finding that "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Id.* at 106.

This Court begins with the undeniable recognition that Minter is in no way "like Range". In determining whether § 922(g)(1) was unconstitutional as applied to Range, the Third Circuit took into consideration the underlying conviction itself (making a false statement to obtain food stamps), the purported reason for Range's actions leading to his conviction (he and his wife struggled to raise "three young children on $300 per week"), the age of the conviction (28 years old), Range's subsequent law-abiding lifestyle, and the reason Range now wanted the firearm (deer hunting and self-defense). *Range*, 69 F.4th at 98-99. Unlike Range who pleaded guilty to a state law misdemeanor over 25 years ago and who has not since engaged in criminal activity, Minter's prior conviction at issue here occurred in 2019 and involves an actual felony, specifically a Pennsylvania state law conviction for Manufacture, Delivery, or Possession with Intent to Manufacture or Deliver a Controlled Substance, in violation of 35 Pa.C.S.A. § 780-113(a)(30). Minter further was previously convicted of a different felony offense in 2013 for violation of probation in violation of Va. Code § 19.2-306, and several misdemeanor offenses from 2013 through 2021, including for simple assault and battery. (*See* Doc. 53, at 9-10). Whereas Range

sold his deer-hunting rifle upon discovering that he was legally barred from having a firearm due to his 1995 conviction, *Range*, 69 F.4th at 98-99, and there is no indication Range ever used his rifle or any other firearm to engage in any illegal activity, Minter is alleged to have brandished the firearm at issue in this case in 2022, while driving, to threaten another driver, and to have had marijuana in the car at the time he was pulled over by the police (Doc. 53, at 5-8). Thus, no factual parallels can be drawn between Range and Minter such that this Court can find that Minter is "like Range" in any manner aside from the general fact that they were both statutorily barred from possessing a firearm due to a prior qualifying criminal conviction.

Nonetheless, the Court turns to Minter's as-applied challenge, applying the legal principles of *Bruen* and *Range*. Here, in light of *Range*, it is evident that Minter is considered one of "the people" protected by the Second Amendment. This Court further assumes for purposes of this analysis that the Second Amendment's plain text covers Minter's conduct, *i.e.* his possession of a firearm.[3] The Court thus examines the central

---

[3] The Government argues that the Second Amendment "does not apply because defendant does not maintain that he possessed a firearm for a lawful purpose." (Doc. 53, at 16; *id.* at 16-18). The Court rejects this argument, which presents an attempt to write a new requirement into the tests set forth in *Bruen* and *Range*. *Cf. United States v. Harper*, 2023 WL 5672311, at *9 (M.D. Pa. 2023) ("even if [Defendant] asserted that he possessed the firearm for the purpose of self-defense, he would still stand accused of violating Section 922(g)(1) because the possession of a firearm for any purpose is a criminal act based on his status as a convicted felon."); *United States v. Quailes*, 2023 WL 5401733, at *8 (M.D. Pa. 2023) ("In a criminal case, a defendant accused of illegal possession of a firearm pursuant to Section 922(g) cannot be required to state his purpose for possessing a firearm without simultaneously admitting the possession, which is an element of the offense. The crux of the Section 922(g)(1) charge is that the mere possession of a firearm is a criminal act due to the defendant's status as a convicted felon.").

9

issue: whether the application of § 922(g)(1) to Defendant Minter is consistent with this Nation's historical tradition of firearm regulation.

The *Bruen* Court provided guidance to aid courts in determining whether the Government has affirmatively demonstrated that the regulation at issue is consistent with this Nation's historical tradition of firearm regulation, explaining that "[i]n some cases," the inquiry that courts must undertake to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding "will be fairly straightforward", *Bruen*, 142 S.Ct. at 2131.

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.*

The Court in *Bruen* nevertheless recognized that while some "historical analogies . . . are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. "The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution – and a Second Amendment – intended to endure for

10

ages to come, and consequently, to be adapted to the various crises of human affairs. Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132 (internal quotation marks and citations omitted). Thus,

> When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy – a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." And because "[e]verything is similar in infinite ways to everything else," one needs "some metric enabling the analogizer to assess which similarities are important and which are not[.]"

*Bruen*, 142 S.Ct. at 2132 (internal citations omitted). "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (italics in original). Further, the *Bruen* Court, while declining to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment", reasoned that

> *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); *see also id.*, at 628, 128 S.Ct. 2783 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry.

*Id.* at 2132-2133 (italics in original).

In the present case, the Government argues that "[t]here is clear historical support for restricting the possession of firearms by persons who, like the defendant, previously committed dangerous felonies." (Doc. 53, at 19). In support of this assertion, the Government presents a series of 17th, 18th, and 19th century purported historical analogues wherein statutes disarmed individuals who were deemed dangerous, untrustworthy, or unlikely to abide by the law. (*See* Doc. 53, at 21-30). Although not expressly stated, it appears both parties agree that § 922(g)(1) implicates "unprecedented societal concerns", and thus whether a historical regulation is a proper analogue for § 922(g)(1) "requires a determination of whether the two regulations are 'relevantly similar.'" *Bruen*, 142 S.Ct. at 2132. In this as-applied challenge, this Court must therefore determine whether the "how and why" of a traditional historical regulation limiting a particular person's ability to possess a firearm is sufficiently analogous to "how and why" § 922(g)(1) burdens Minter's right to armed self-defense, *i.e.*, whether § 922(g)(1) and the historical regulations set forth by the Government impose a comparable burden on Minter's right of armed self-defense and whether that burden is comparably justified. *See id.* at 2132-2133.

In *Range*, the Circuit Court rejected the Government's argument that "'legislatures traditionally used status-based restrictions' to disarm certain groups of people" as support for finding a historical analogue to the situation faced by Range, reasoning that:

> Apart from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances. That Founding-era governments disarmed groups

12

>they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be "far too broad[ ]." *See Bruen*, 142 S. Ct. at 2134 (noting that historical restrictions on firearms in "sensitive places" do not empower legislatures to designate any place "sensitive" and then ban firearms there).

*Range*, 69 F.4th at 104-105.

Although the Third Circuit Court found that Range "and his individual circumstances" were not sufficiently analogous to "groups [the founding-era governments] distrusted", the same cannot be said of Minter. As previously set forth, *supra*, Minter is not "like Range." Range was convicted of making a false statement to obtain food stamps, a misdemeanor violation of state law, and was sentenced to three-years probation whereas Minter was convicted of a state law drug felony offense and sentenced to 9-24 months incarceration. Historically, there is little evidence that the crime for which Range was convicted had any clear founding-era analogue, and even if it did, that it was a crime a consequence of which a person could be barred from the possession of a firearm. Conversely, the same concerns underlying the disarmament of "distrusted" groups such as "Loyalists, Native Americans, Quakers, Catholics, and Blacks" support the prohibition of firearms by felons convicted of a drug-trafficking offense. *Cf. Range*, 69 F.4th at 112 ("Range committed a small-time offense. He did so with a pen to receive food stamps for his family. There is nothing that suggests he is a threat to society. He therefore stands apart from most other individuals subject to § 922(g)(1) whom we fear much like early Americans feared loyalists. . .") (Ambro, J., concurring).

In her dissent in *Range*, Judge Krause set forth an extensive survey of 17th, 18th, and 19th century law relating to the prohibition of firearms by certain individuals.[4] Judge Krause first noted that "[d]uring the late seventeenth century, the English government repeatedly disarmed individuals whose conduct indicated that they could not be trusted to abide by the sovereign and its dictates", *Range*, 69 F.4th at 120 (Krause, J., dissenting). Thereafter,

> [t]he English notion that the government could disarm those not considered law-abiding traveled to the American colonies. Although some of the earliest firearm laws in colonial America forbid Native Americans and Black persons from owning guns, the colonies also repeatedly disarmed full-fledged members of the political community as it then existed – i.e., free, Christian, white men – whom the authorities believed could not be trusted to obey the law.

*Id.* at 122. As colonies became independent during the Revolutionary War, state legislatures "continued to disarm individuals whose status indicated that they could not be trusted to obey the law." *Id.* at 124. Certain "state legislatures conditioned their citizens' ability to keep arms on compliance with that civic obligation [to comply with communal judgments regarding proper behavior], and several states enacted statutes disarming all those who refused to recognize the sovereignty of the new nation." *Id.* Judge Krause's historical survey is also largely paralleled in Judge Ambro's concurring opinion in *Range*:

> We begin with a look to firearm regulation in the era of the Second Amendment's ratification. In England, non-Anglican Protestants and Catholics were disarmed during times of tumult. *See Range v. Att'y Gen.*, 53 F.4th 262,

---

[4] The Court recognizes that Judge Krause dissented in *Range*, but cites to her thorough historical review to demonstrate why historical analogues which the majority found to be inapplicable to Range are nonetheless sufficiently relevantly similar historical analogues to § 922(g)(1) as applied to Minter.

14

>  274-76 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023). The American colonies also disarmed religious dissenters. *See id.* at 276-77. And in the Revolutionary War period, British loyalists and those who refused to take loyalty oaths were disarmed by several colonies. *See id.* at 277-79. *See also* [*United States v.*] *Jackson*, 69 F.4th [69 F.4th 495, 502-03 (8th Cir. 2023)].
>
>  True, those laws are, by today's standards, unconstitutional on non-Second Amendment grounds. But at our Founding they were measures driven by the fear of those who, the political majority believed, would threaten the orderly functioning of society if they were armed. From this perspective, it makes sense that § 922(g)(1) is presumptively lawful. Society is protecting itself by disarming, *inter alia*, those who murder, rob, possess child porn, and leak classified national security information. *See id.* at 504-06. Most felons have broken laws deemed to underpin society's orderly functioning, be their crimes violent or not. Section 922(g)(1) thus disarms them for the same reason we prohibited British loyalists from being armed.

*Range*, 69 F.4th at 111-112 (Ambro, J., concurring); *id.* at 110 (Judge Ambro stating § 922(g)(1) remains presumptively lawful "because it fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society" and explaining that the fact that "Range does not conceivably pose such a threat says nothing about those who do."); *see also, id.* at 115 ("The felon designation . . . serves as a proxy for disloyalty and disrespect for the sovereign and its laws.") (Shwartz, J., dissenting). *See also, United States v. Folajtar v. Att'y Gen.*, 980 F.3d 897, 908 (3d Cir. 2020), *abrogated by Range v. Att'y Gen.*, 69 F.4th 96 (2023), ("[w]hat concerned the Framers was that 'virtuous citizens' retain the right to bear arms. . . ; they had no interest in extending the same guarantee to those who act counter to society's welfare, whether by violent or non-violent acts.") (internal citation omitted); *United States v.*

15

*Reichenbach*, 2023 WL 5916467, at *6-7 (M.D.Pa. 2023) (setting forth 18th and 19th century laws targeting "groups that lawmakers deemed dangerous and disruptive to society, and [which] were aimed at protecting the public from violence and disorder."); *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) ("founding era-legislatures categorically disarmed groups whom they judged to be a threat to the public safety.") (Barrett, J., dissenting).[5]

This Court agrees with the Government's position that a number of historical statutes disarming individuals who were deemed dangerous, untrustworthy, or unlikely to abide by the law are proper historical analogues to § 922(g)(1), and specifically to § 922(g)(1)'s application to Minter (*see* Doc. 53, at 21-30). The analogue rests in the identification by the Government of persons who could be lawfully disarmed, specifically those who were deemed a threat to "the orderly functioning of society", *Range*, 69 F.4th at 110, irrespective of the differences between those who were perceived to fit within that status at the time of the Founding and the ratification of the 14th Amendment and Minter at present.[6]

With respect to the "how" and "why" metrics set forth in *Heller* and re-iterated in *Bruen*, the historical analogues demonstrate that in the 17th and 18th centuries, lawmakers

---

[5] This Court notes that the Third Circuit in *Range* expressly declined to determine whether "dangerousness" is the touchstone in determining whether there is a sufficiently analogous statute or regulation permitting the disarmament of certain groups of people. *Range*, 69 F.4th at 104 n. 9.

[6] To find otherwise would almost certainly render § 922(g)(1) inapplicable as-applied to any offender. To the extent that a reading of *Bruen* or *Range* would be said to require that the perceived evil or threat justifying the prohibition on the possession of arms must be of the same content, then it may reasonably be said that there is no analogy that can be found given the chasm between those perceived social threats permitting the prohibition of arms in 18th and 19th century America and those of the 20th and 21st centuries.

determined that the pre-existing right of an individual to possess a firearm could be restricted or prohibited in order to ensure the orderly function of society and prevent disruptions thereto. The individuals clearly encompassed within one group of those whose right could be curtailed included those who could not be trusted to obey the law or who the legislatures deemed to be dangerous or a threat to public safety. This group necessarily encompasses in today's society individuals convicted of felony offenses involving the manufacture, possession, and sale of illegal controlled substances. This is evident where, in modern society, drugs are being regularly distributed to the great detriment and harm to society, an ill Congress has repeatedly attempted to curb through the enactment of numerous laws relating to both controlled substances and firearms. Consistent with Congress' intent, the Supreme Court and the Third Circuit have repeatedly recognized the dangerous and often interdependent relationship between drugs and firearms and its inherent threat to public safety and the orderly functioning of society. *See e.g., Smith v. United States*, 508 U.S. 223, 240 (1993) ("When Congress enacted the current version of § 924(c)(1), it was no doubt aware that drugs and guns are a dangerous combination."); *Muscarello v. United States*, 524 U.S. 125, 132 (1998); *United States v. Cheeseman*, 600 F.3d 270, 280 (3d Cir. 2010) (holding that possession of firearms and ammunition is sufficient for a district court to find that property was "involved in" a § 922(g)(3) offense and explaining that "[t]his interpretation of 'involved in' makes sense in light of Congress' intent to keep firearms out of the possession of drug abusers, a dangerous class of individuals. . .

."); *United States v. Walker*, 473 F.3d 71, 79 (3d Cir. 2007) ("in imposing the mandatory consecutive sentences for second or subsequent offenders in Section 924(c)(1), '[i]t is likely that Congress meant ... to protect our communities from violent criminals who repeatedly demonstrate a willingness to employ deadly weapons by punishing them more harshly.'") (quoting *United States v. Couch,* 291 F.3d 251, 255 (3d Cir. 2002)). *See also,* 18 U.S.C. § 922(q)(1)(A)-(B) (setting forth Congress' finding that "crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem" and that "crime at the local level is exacerbated by the interstate movement of drugs, guns, and criminal gangs").

Here, *Bruen* and *Range* do not aid Minter in succeeding in his Constitutional challenge. Range and Minter were not "[a]like" in any meaningful way and the absence of a historical analogue for disarming a person convicted of a crime such as making a false statement to obtain food stamps cannot be reasonably read to suggest that no historical analogues exist which are sufficiently "relevantly similar" such that § 922(g)(1) is unconstitutional as-applied to this defendant.[7] Although Minter is one of "the people" protected by the Second Amendment and the plain text of that Amendment covers Minter's conduct of possessing a firearm, the Government has affirmatively demonstrated that § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation as applied to Minter.

---

[7] In performing its analysis to determine the potential existence of a historical analogue in connection with this case, this Court has threaded the eye of the needle which *Bruen* requires as a condition of finding the requisite analogue for determining the constitutionality of a firearm regulation in current times.

### III. CONCLUSION

For the reasons set forth herein, Defendant Minter's "Motion for Reconsideration of Order of October 18, 2022" (Doc. 49) will be denied. A separate Order follows.

                                                                                      _____
                                                                                      Robert D. Mariani
                                                                                      United States District Judge